[No. S067733. Mar. 25, 1999.]

DAWNELLE BARRIS, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

Kenneth M. Sigelman & Associates, Kenneth M. Sigelman and Penelope A. Phillips for Plaintiff and Appellant.

Shernoff, Bidart, Darras & Arkin and Sharon J. Arkin for Consumers for Quality Care as Amicus Curiae on behalf of Plaintiff and Appellant.

Drivon & Tabak, Laurence E. Drivon; Douglas Devries; Roland Wrinkle; Harvey R. Levine; Robert Steinberg; Thomas G. Stolpman; David Rosen; Moses Lebovits; Bruce Brusavitch; Bruce Broilett; Wayne McLean; Leonard Sacks; Tony Tanke; Stewart Tabak; Rick Simons; David Casey, Jr.; Christine Spagnoli; James Sturdevant; Daniel U. Smith; Deborah David; Joseph Harbison III; and Cynthia Chihak for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Houck & Balisok, Russell S. Balisok, Steven C. Wilheim; and Peter G. Lomhoff for California Advocates for Nursing Home Reform, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Veatch, Carlson, Grogan & Nelson, Mark Weinstein, William G. Lieb; Greines, Martin, Stein & Richland, Timothy T. Coates and Alison M. Turner for Defendant and Appellant.

Horvitz & Levy, Mitchell C. Tilner and L. Rachel Lerman Helyar for Program Beta Risk Management Authority as Amicus Curiae on behalf of Defendant and Appellant.

Thelen, Marrin, Johnson & Bridges, Curtis A. Cole and Matthew S. Levinson for California Medical Association, California Dental Association and California Healthcare Association as Amici Curiae on behalf of Defendant and Appellant.

**OPINION**

**MOSK, J.**—In this matter, a hospital operated by the County of Los Angeles (hereafter the County) transferred Mychelle Williams to another hospital without providing treatment required to stabilize her emergency medical condition, in violation of section 1395dd of title 42 of the United States Code, the Emergency Medical Treatment and Active Labor Act (EMTALA). She died shortly thereafter. Dawnelle Barris, Mychelle's mother, was awarded damages for the EMTALA violation, including $1,350,000 in noneconomic damages.

We granted review to address the question whether the award was subject to the $250,000 limit on noneconomic damages under Civil Code section 3333.2, which applies to causes of action "based on professional negligence." The answer is affirmative. The EMTALA claim for failure to "stabilize" Mychelle's emergency medical condition, i.e., "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer" (42 U.S.C. § 1395dd(e)(3)(A)), was "based on professional negligence." Accordingly, we affirm the judgment of the Court of Appeal, which arrived at the same conclusion.

I

On May 6, 1993, at approximately 5:30 p.m., Dawnelle Barris (hereafter Barris) brought her 18-month old daughter, Mychelle Williams, to the emergency room at Martin Luther King/Drew Medical Center (hereafter King/Drew) by ambulance. Mychelle was a member of the Kaiser Foundation Health Plan (hereafter Kaiser), but was taken to King/Drew because it was the nearest emergency medical facility. She had suffered episodes of vomiting and diarrhea, was lethargic, and was having difficulty breathing. Her temperature was 106.6 degrees, her pulse and respiratory rate were abnormally fast, she had abnormally low pulse oxygenation, and she had infections of the middle ear in both ears.

Mychelle was transferred to the pediatric emergency room, and examined by Dr. Trach Phoung Dang. He believed her fever might be caused by bacteria in the bloodstream. He noted signs and symptoms consistent with sepsis, a life-threatening bacterial infection that he knew requires prompt treatment with antibiotics. Nonetheless, he did not rule out sepsis or begin antibiotic treatment. Although he concluded that a complete blood culture, which could have detected sepsis, should be done, he did not order it because

he believed that he had to obtain authorization from Kaiser. Kaiser had developed a program called the Emergency Prospective Review Program (EPRP) to deal with situations where a Kaiser member is brought to a non-Kaiser facility for emergency medical care. Its purpose was to facilitate the transfer of such patients to a Kaiser facility.

On the night of May 6, Brian Thompson, a Kaiser physician, was handling phone calls that came in under the EPRP. At approximately 7 p.m., Dr. Dang spoke by telephone to Dr. Thompson to arrange for possible transfer of Mychelle. Dr. Dang discussed her condition and indicated that he thought blood tests, which would rule out a bacterial infection in the blood, should be performed at King/Drew. Dr. Thompson instructed him not to perform the tests, saying that the blood work would be done at Kaiser. Apparently still concerned about the delay in treatment, Dr. Dang telephoned Dr. Thompson again, and repeatedly suggested starting the blood work at King/Drew. Again, Dr. Thompson instructed Dr. Dang not to do so. Dr. Dang noted in his chart that "Dr. Thompson at Kaiser did not want me to do any blood test."

At approximately 8 p.m., Mychelle suffered a seizure. She became increasingly lethargic and nonresponsive. Dr. Dang treated her symptoms of fever, dehydration, breathing difficulty, and seizure, but did not administer antibiotics.

Shortly after 9 p.m., Mychelle was transferred by ambulance to Kaiser. At 9:50 p.m., within 15 minutes of her arrival, Mychelle suffered a cardiac arrest and was pronounced dead shortly thereafter. A blood culture performed as part of an autopsy was positive for streptococcus bacteria, which is readily treatable by antibiotics. The death certificate listed cardiac respiratory arrest caused by septicemia, or sepsis, that had been present for 10 hours.

Barris brought an action for professional negligence against the County, Kaiser, and Drs. Dang and Thompson, and an action for violation of EMTALA against the County. The EMTALA claim alleged failure to provide appropriate medical screening of Mychelle and failure to stabilize her emergency medical condition before transferring her to Kaiser.

On November 14, 1995, a jury trial began. Dr. Dang testified that he knew sepsis was a possible cause of Mychelle's fever. He explained that blood work, which would rule out a bacterial infection in the blood, was not done at King/Drew because Dr. Thompson said that it would be done at Kaiser. He also testified that he did not believe Mychelle had sepsis and thought that she was stable at the time she was transferred.

An expert for Barris opined, based on review of the medical record and Dr. Dang's testimony, that Dr. Dang actually believed or suspected that Mychelle was suffering from sepsis. According to the expert, the standard of care required that antibiotics be administered to Mychelle for possible sepsis and that she be given treatment for her abnormal respiratory status. Dr. Dang failed to meet the standard of care by failing to place Mychelle on intravenous antibiotics or to stabilize her respiratory status. At the time of her transfer, Mychelle was unstable. There was a high risk, i.e., a reasonable medical probability, that her condition would deteriorate if she were transferred. Another expert agreed that "the information obtained to that point had to lead one to the conclusion that she was not stable for transfer, and that the likelihood of there being a significant deterioration during that period of time was very real."

The County moved for a nonsuit as to the medical screening and failure to stabilize claims under EMTALA. The superior court granted the County's motion for a nonsuit as to the medical screening claim only, concluding that Barris presented evidence sufficient for the jury to conclude that Mychelle was treated for an emergency medical condition and was not stable for transfer when she was taken to Kaiser.

The jury returned a special verdict in favor of Barris both on the professional negligence cause of action and the failure to stabilize claim under EMTALA. It awarded noneconomic damages in the amount of $1,350,000 in addition to funeral expenses of $3,000.

The superior court ruled that the cap on noneconomic damages under Civil Code section 3333.2 applied to the EMTALA claim as well as the professional negligence action. It reduced the award of noneconomic damages to $250,000.

Barris appealed the superior court's application of Civil Code section 3333.2, but did not appeal the nonsuit on the screening claim under EMTALA. The County cross-appealed, contending that the jury's finding of a violation under EMTALA for failure to stabilize was not supported by the evidence. It conceded, however, that the Court of Appeal need not address the cross-appeal if it determined that the damages cap under Civil Code section 3333.2 applied to the EMTALA claim.

The Court of Appeal affirmed, concluding that the cap on noneconomic damages under Civil Code section 3333.2 applied to the EMTALA claim. Relying on *Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181, 191-192 [10 Cal.Rptr.2d 208, 832 P.2d 924] (hereafter

*Central Pathology*), it determined that Civil Code section 3333.2 applies broadly to any cause of action against a health care provider that is "directly related" to the professional services provided. It cited, as persuasive authority, the Fourth Circuit's decision in *Power* v. *Arlington Hosp. Ass'n* (4th Cir. 1994) 42 F.3d 851 (hereafter *Power*), which applied Virginia's $1 million cap on medical malpractice awards to EMTALA claims. It did not reach the question whether substantial evidence supported the jury's finding of an EMTALA violation.

We granted review. We now affirm the judgment.

## II

We begin with an overview of the two provisions at issue here, Civil Code section 3333.2, and section 1395dd of title 42 of the United States Code.

Civil Code section 3333.2 was enacted as part of the 1975 Medical Injury Compensation Reform Act (MICRA), to reduce the costs of liability insurance for health care providers. It limits damage awards in professional negligence actions against health care providers, requiring that "[i]n any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage." (*Id.*, subd. (a).) It further provides that "[i]n no such action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000.)" (*Id.*, subd. (b).) It defines the term "professional negligence" to mean "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (*Id.*, subd. (c)(2).) Thus, at a minimum, it applies to traditional malpractice claims against health care providers, based on failure to meet the applicable standard of care in providing professional services. (*Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695, 701-703 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063].)[1]

EMTALA was enacted as part of the Comprehensive Omnibus Budget Reconciliation Act of 1986 (COBRA). It provides that hospitals that have

---

[1] "The standard of care in a medical malpractice case requires that medical service providers exercise that . . . degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances. The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action . . . ." (*Alef* v. *Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215 [6 Cal.Rptr.2d 900].)

entered into Medicare provider agreements are prohibited from inappropriately transferring or refusing to provide medical care to "any individual" with an emergency medical condition. (42 U.S.C. § 1395dd.)[2]

Under EMTALA, hospitals with emergency departments have two obligations. First, if any individual comes to the emergency department requesting examination or treatment, a hospital must provide for "an appropriate medical screening examination within the capability of the hospital's emergency department." (42 U.S.C. § 1395dd(a).) Second, if the hospital "determines that the individual has an emergency medical condition," it must provide "within the staff and facilities available at the hospital" for "such treatment as may be required to stabilize the medical condition" and may not transfer such a patient until the condition is stabilized or other statutory criteria are fulfilled. (*Id.*, § 1395dd(b) & (c).)[3]

EMTALA defines the term "emergency medical condition" as meaning "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . [¶] . . . placing the health of the individual . . . in serious jeopardy, [¶] . . . serious impairment to bodily functions, or [¶] . . . serious dysfunction of any bodily organ or part." (42 U.S.C. § 1395dd(e)(1)(A).) It defines "to stabilize" as meaning "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from the facility. . . ." (42 U.S.C. § 1395dd(e)(3)(A).)

An individual who "suffers personal harm as a direct result" of a hospital's failure to meet the requirements under EMTALA may bring a civil action seeking damages and appropriate equitable relief against the participating hospital. (42 U.S.C. § 1395dd(d)(2)(A).)

---

[2]Although EMTALA was passed in response to concern by the Congress that hospitals were engaging in "patient dumping"— i.e., refusing medical treatment or transferring indigent and uninsured patients from private to public hospitals to avoid the costs of treatment—it applies to all patients seeking emergency treatment, without regard to ability to pay or insurance. (See *Thornton* v. *Southwest Detroit Hosp.* (6th Cir. 1990) 895 F.2d 1131, 1134, 104 A.L.R. Fed. 157; *Deberry* v. *Sherman Hospital Assn.* (N.D.Ill. 1990) 741 F.Supp. 1302, 1306.)

[3]Specifically, the hospital may not transfer such a patient unless "the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations . . . and of the risk of transfer, in writing requests transfer to another medical facility," the physician has signed a certification that "based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . ." and the transfer is "an appropriate transfer . . . to that facility." (42 U.S.C. § 1395dd(c)(1).) The County did not purport to follow the special transfer rules under this subsection.

■ As pertinent here, the elements of a civil claim for failure to stabilize include the following: (1) the hospital had actual knowledge that a patient was suffering from an "emergency medical condition"; and (2) did not, within the staff and facilities available at the hospital, provide for necessary stabilizing treatment before transfer or discharge, i.e., the transfer or discharge was not medically reasonable under the circumstances; and (3) the patient suffered personal harm as a direct result.

■ In stabilizing a patient, a hospital must, within the staff and facilities available to it, meet requirements that relate to the prevailing standard of professional care: it must give the treatment medically necessary to stabilize a patient and it may not discharge or transfer the patient unless it provides "treatment that medical experts agree would prevent the threatening and severe consequences of [the patient's emergency medical condition] while [he or] she was in transit." (*Burditt* v. *U.S. Dept. of Health and Human Services* (5th Cir. 1991) 934 F.2d 1362, 1369; see also *id.* at p. 1370, fn. 8 [noting that "Congress only mandates treatment 'within the staff and facilities available at the hospital' "].) ■ A plaintiff is not required to establish that failure to provide such treatment was based on an improper motive, such as racial discrimination or financial considerations about payment or reimbursement. As the United States Supreme Court explained in *Roberts* v. *Galen of Virginia, Inc.* (1999) 525 U.S. 249, __ [119 S.Ct. 685, 687, 142 L.Ed.2d 648]: "[42 United States Code section] 13955dd(b) contains no express or implied 'improper motive' requirement."

■ A claim under EMTALA for failure to stabilize is thus necessarily "based on professional negligence" within the meaning of MICRA—it involves "a negligent . . . omission to act by a health care provider in the rendering of professional services" (Civ. Code, § 3333.2, subds. (a), (c)(2))—although it requires more. Proof of professional negligence does not suffice as proof of a violation of EMTALA. EMTALA differs from a traditional state medical malpractice claim principally because it also requires *actual knowledge* by the hospital that the patient is suffering from an emergency medical condition and because it mandates only stabilizing treatment, and only such treatment as can be provided *within the staff and facilities available at the hospital.* EMTALA thus imposes liability for failure to stabilize a patient only if an emergency medical condition is actually discovered, rather than for negligent failure to discover and treat such a condition. In addition, EMTALA imposes only a limited duty of medical treatment: a hospital need provide only sufficient care, within its capability, to stabilize the patient, not necessarily to improve or cure his or her

condition. Once the medical condition is stabilized, the hospital may discharge or transfer the patient without limitation.[4]

Congress expressly provided that state law provisions limiting the recovery of damages are applicable to EMTALA claims: "Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement [under EMTALA] may, in a civil action against the participating hospital, obtain *those damages available for personal injury under the law of the State in which the hospital is located,* and such equitable relief as is appropriate." (42 U.S.C. § 1395dd(d)(2)(A), italics added.)[5]

## III

■ We turn now to the specific question before us: whether damages under EMTALA in a claim based on failure to stabilize are subject to the cap on noneconomic damages under Civil Code section 3333.2.[6]

---

[4]Although a hospital's actual knowledge of an emergency medical condition will generally be based on the "appropriate medical screening examination" required by 42 United States Code section 1395dd(a), most federal courts have concluded that EMTALA requires only that the hospital provide *uniform* medical screening to all patients who come to the emergency department. (See, e.g., *Gatewood* v. *Washington Healthcare Corp.* (D.C. Cir. 1991) 933 F.2d 1037, 1041 [290 App.D.C. 31] ["[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms . . . its treatment of a particular patient to its standard screening procedures."]; *Baber* v. *Hospital Corp. of America* (4th Cir. 1992) 977 F.2d 872, 879-880 [EMTALA "establishes a standard which will of necessity be individualized for each hospital, since hospital emergency departments have varying capabilities."]; *Roberts* v. *Galen of Virginia, Inc., supra,* 525 U.S. at p. __ [119 S.Ct. at p. 687 & fn. 1] [noting that some federal courts have required an "improper motive" in medical screening claims, but "express[ing] no opinion" on the question].) For this reason many federal courts have observed that a medical screening claim under EMTALA is not a substitute for state malpractice actions, although "there may arise some areas of overlap between federal and local causes of action." (*Gatewood* v. *Washington Healthcare Corp., supra,* 933 F.2d at p. 1041; see also, e.g., *Holcomb* v. *Monahan* (11th Cir. 1994) 30 F.3d 116, 117.) Because Barris's medical screening claim was dismissed, we express no opinion on the question whether such a claim would be subject to limitations on damages under MICRA.

[5]EMTALA also provides for civil money penalties. A participating hospital is subject to a penalty of not more than $50,000—or $25,000 in the case of hospitals with fewer than 100 beds (42 U.S.C. § 1395dd(d)(1)(A)); it may also be terminated from Medicare participation for EMTALA violations (*id.,* § 1395cc(b)(2)(A)). Physicians are subject to a penalty of not more than $50,000 for each violation of EMTALA (*id.,* § 1395dd(d)(1)) and may also be barred from participation in Medicare (*id.,* § 1395dd(d)(1)(B)(ii)).

[6]Like the Court of Appeal, we accept as true the jury's findings of fact. As the record indicates, it found that the County violated EMTALA by failing to stabilize Mychelle before transferring her to Kaiser, i.e., that Dr. Dang actually determined that she was suffering from an emergency medical condition and failed to provide medical treatment necessary to assure, within reasonable medical probability, that no material deterioration of the condition would result from or occur during transfer to Kaiser. The jury apparently rejected Dr. Dang's testimony on these disputed points.

As discussed, EMTALA expressly incorporates state substantive limits on "damages available for personal injury" (42 U.S.C. § 1395dd(d)(2)(A)). Like the Fourth Circuit in *Power*, we are persuaded that Congress's choice of the term "personal injury" was intended to be inclusive, i.e., to incorporate not only any *general* provisions for personal injury damages, but also any *specific* provisions, such as limits applicable to malpractice damages. (*Power, supra*, 42 F.3d at p. 862 [Construing 42 United States Code section § 1395dd(d)(2)(A) "as reflecting Congress' deliberate choice of the more inclusive phrase 'personal injury' so that it would not be necessary to delineate each and every type of limitation on damages . . . that the states might have enacted."].) Congress was not required to refer specifically to malpractice damages caps or limitations on noneconomic damages, or to use other explicitly limiting language, in order to incorporate such limits. (42 F.2d at p. 862.)

We discern no conflict between the purposes of providing for a private right to recover damages for violations of EMTALA and state law limits on malpractice damages. "[T]he ends of both the federal and state statutes are to keep medical care accessible." (*Jackson* v. *East Bay Hosp.* (N.D.Cal. 1997) 980 F.Supp. 1341, 1347.) Indeed, the apparent intent of Congress was to balance the deterrence and compensation goals of EMTALA with deference to the ability of states to determine what limits are appropriate in personal injury actions against health care providers. Thus, the legislative history suggests that in drafting EMTALA to incorporate state law limits on personal injury damages, Congress was specifically responding to concern "regarding 'the potential impact of these enforcement provisions on the current medical malpractice crisis.'" (*Power, supra*, 42 F.3d at p. 862, quoting H.R.Rep. No. 99-241, 1st Sess., pt. 3, p. 6 (1986).) "Congress apparently wished to preserve state-enacted ceilings on the amount of damages that could be recovered in EMTALA . . . ." (42 F.3d at p. 862.)

Most federal courts that have addressed the point have applied particular state caps on malpractice damages to EMTALA claims. Thus, in *Power*, the Fourth Circuit determined that a claim under EMTALA based on failure to provide appropriate medical screening was subject to its cap of $1 million on damages for medical malpractice claims. (*Power, supra*, 42 F.3d at pp. 861-863; see also *Reid* v. *Indianapolis Osteopathic Medical Hosp.* (S.D.Ind. 1989) 709 F.Supp. 853, 855-856 [holding that an award under EMTALA was subject to Indiana's substantive limitation on the maximum amount recoverable for personal injury from a health care provider]; *Diaz* v. *CCHC-Golden Glades, Ltd.* (Fla.Dist.Ct.App. 1997) 696 So.2d 1346, 1347 [Holding that EMTALA "incorporates all the vagaries of the state medical malpractice law in determination of the damages recoverable in an action under the

Act."]; but see *Jackson* v. *East Bay Hosp.*, *supra*, 980 F.Supp. 1341 [holding that MICRA limit on noneconomic damages does not apply to EMTALA claim]; cf. *Cooper* v. *Gulf Breeze Hosp., Inc.* (N.D.Fla. 1993) 839 F.Supp. 1538 [patient was not required to comply with Florida's presuit procedural requirements for medical malpractice actions to maintain a suit under EMTALA].)[7]

In determining whether a particular state's damages cap applies to an EMTALA violation, federal courts have looked at the underlying conduct challenged and its legal basis to determine whether, *if brought under state law*, it would constitute a cause of action subject to the cap. Thus, in *Power*, the Fourth Circuit determined that although the plaintiff alleged disparate treatment, not a breach of the standard of care associated with a traditional medical malpractice claim, damages for the EMTALA violation would nonetheless be subject to Virginia's $1 million cap on malpractice damages because the cap applies broadly to " 'any tort based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient.' " (*Power, supra,* 42 F.3d at p. 861, citing Va. Code Ann. §§ 8.01-581.15, 8.01-581.1 (Michie Supp. 1993).) *Power* stressed that, as interpreted by Virginia courts, the cap on malpractice damages had not been limited to "traditional medical malpractice claims arising from breaches of the professional standard of care," but also applied to claims of battery and sexual misconduct by a physician. (42 F.3d at p. 861.)

We find the analytical approach of the Fourth Circuit on this point persuasive. Accordingly, the issue here is whether a claim under EMTALA based on failure to stabilize, *if brought under state law*, would constitute an action subject to Civil Code section 3333.2, i.e., an "action for injury against a health care provider based on professional negligence." We conclude that it would.

The cap on damages under Civil Code section 3333.2 applies to injuries "based on professional negligence," i.e., medical treatment falling below the professional standard of care. As discussed, although it is not identical to a

---

[7]*Cooper* explains that Florida's statute conditions damages caps on the pre-suit procedures followed by the parties to an action for malpractice: "For example, Florida's medical malpractice statute allows either a potential plaintiff or defendant to offer to arbitrate the amount of damages in a malpractice action rather than have this issue go to trial. [Citation.] If the potential plaintiff refuses to arbitrate, then their recovery for noneconomic damages at trial is capped at $350,000 per incident of malpractice." (*Cooper* v. *Gulf Breeze Hosp., Inc.,* *supra,* 839 F.Supp. at pp. 1541-1542, fn. 5.) Although *Cooper* was decided before *Power*, it would appear that its result is also consistent with the holding therein that EMTALA preempts state *procedural* restrictions on malpractice claims. (*Power, supra,* 42 F.3d at p. 866.)

state malpractice claim because it includes additional requirements, an EMTALA claim for failure to stabilize is "based on professional negligence." A plaintiff must prove that the hospital did not, within its available staff and facilities, provide a patient known to be suffering from an emergency medical condition with medical treatment necessary to assure, within reasonable medical probability, that no deterioration of the condition would likely occur. The standard of "reasonable medical probability" is an objective one, inextricably interwoven with the professional standard for rendering medical treatment.

To be sure, every claim for professional negligence does not also constitute an EMTALA claim for failure to stabilize. A claim under EMTALA also requires proof that the hospital actually determined that the patient was suffering from an emergency medical condition, and a hospital must provide required treatment only to stabilize a patient, i.e., to assure, within its capability, "no material deterioration of the condition" upon transfer or discharge. But an EMTALA claim based on failure to provide medically reasonable treatment to stabilize a patient would, if brought under state law, constitute a claim of "professional negligence" as defined by Civil Code section 3333.2. The EMTALA claim for failure to stabilize has additional, but no inconsistent, elements. Thus, the medical causation proof required to establish an EMTALA claim that a hospital failed to provide medical treatment to assure, within reasonable medical probability, that the patient's condition would not materially deteriorate is the same as that which would be required to prove "a negligent act or omission to act by a health care provider . . . which . . . is the proximate cause of personal injury or wrongful death." (Civ. Code, § 3333.2, subd. (c)(2).) The trier of fact must, under EMTALA as in a medical negligence claim, consider the prevailing medical standards and relevant expert medical testimony to determine whether material deterioration of the patient's condition was reasonably likely to occur.

Plaintiff urges that we should be guided by the federal district court in *Jackson* v. *East Bay Hosp.*, *supra*, 980 F.Supp. at page 1348, which held that MICRA's cap on damages is inapplicable to EMTALA claims. We find the holding in *Jackson* unpersuasive. It relies on the erroneous premise that EMTALA claims "do not rest on any proof that the hospital was negligent or that the hospital failed to . . . provide adequate treatment." (*Ibid.*) Moreover, it incorrectly asserts that EMTALA makes hospitals "strictly liable" and requires proof of the hospital's *intentional* refusal of care: "EMTALA creates a separate cause of action which makes hospitals strictly liable for refusing 'essential emergency care because of a patient's inability to pay.' " (*Ibid.*) As discussed, EMTALA requires hospitals, within the staff and

facilities available, to adhere to a certain level of professional care in treating patients who have been determined to have an emergency medical condition. It is not a strict liability statute. Rather, a stabilization claim under EMTALA is based on whether the hospital, within the staff and facilities available to it, provided medical treatment necessary to assure "within medical probability" that no material deterioration of a patient's condition would occur during transfer to another facility. Strict liability, by contrast, would automatically impose responsibility for an injury to the patient, regardless of the treatment given. Nor does EMTALA require proof of a hospital's intentional refusal of care, e.g., based on a patient's inability to pay or other bad faith motive. (See *Roberts* v. *Galen of Virginia, Inc.*, *supra*, 525 U.S. at p. __ [119 S.Ct. at p. 687] [improper motive not required to establish a failure to stabilize under EMTALA].)[8]

The County urges that the cap on damages under Civil Code section 3333.2 should be extended to apply not only in cases of "professional negligence," but, more broadly, whenever the injury for which damages are sought is *directly related* to the professional services rendered by a health care provider. In support of that proposition, it cites our holding in *Central Pathology* that Code of Civil Procedure section 425.13, a non-MICRA provision regarding the availability of punitive damages against a health care provider, was not "limited to causes of action alleging professional negligence." (*Central Pathology*, *supra*, 3 Cal.4th at p. 188.)

The Court of Appeal, adopting the approach urged by the County, extended the broad interpretation of the phrase "arising under professional negligence" in *Central Pathology* to all MICRA provisions, including the damages cap under Civil Code section 3333.2. It concluded that because the County's failure to stabilize Mychelle was "directly related" to the rendering of medical services, any damages under EMTALA were limited to $250,000.

We have not previously held that MICRA applies to intentional torts. Nor does *Central Pathology*, which involved a non-MICRA provision, so hold.

---

[8]For these reasons, too, we reject plaintiff's contention that this matter is a so-called "hybrid" action, i.e., one involving both negligence claims subject to MICRA and "non-negligence" claims (i.e., the EMTALA claims) which are not. Thus, we are not persuaded that it is analogous to *Flores* v. *Natividad Medical Center* (1987) 192 Cal.App.3d 1106 [238 Cal.Rptr. 24], which involved both negligence claims against individual physicians and a claim under Government Code section 845.6 based on the failure by state employees, some of whom were physicians, to summon medical care. *Flores* held that MICRA did not apply to the failure-to-summon claim because "the true nature of the action against the State" was not "one for professional negligence" simply because "fortuitously, the employees who failed to summon assistance were doctors"; nor was the state operating as a "health care provider" as defined in MICRA. (192 Cal.App.3d at pp. 1116-1117.) In this matter, by contrast, we are persuaded that the stabilization claim under EMTALA is indeed "based on professional negligence" for the reasons discussed in the text; nor is there any dispute that the County was a "health care provider" as defined by MICRA. (Civ. Code, § 3333.2, subd. (c)(1).)

As explained in our recent decision in *Delaney* v. *Baker* (1999) 20 Cal.4th 23, 40 [82 Cal.Rptr.2d 610, 971 P.2d 986], *Central Pathology* did not purport to define the meaning of the term "professional negligence" as used in MICRA. "To claim that the *Central Pathology* definition extended beyond [Code of Civil Procedure] section 425.13(a) is to ignore the limitations that this court put on its own opinion." (*Delaney* v. *Baker, supra,* 20 Cal.4th at p. 40 [concluding that a cause of action for "reckless neglect" under the Elder Abuse and Dependent Adults Civil Protection Act, Welfare and Institutions Code, section 15600 et seq., is distinct from a cause of action "based on professional negligence" within the meaning of section 15657.2].) Rather, *Central Pathology* emphasized that the scope and meaning of the phrases "arising from professional negligence" and "based on professional negligence" could vary depending upon the legislative history and "the purpose underlying each of the individual statutes." (*Central Pathology, supra,* 3 Cal.4th at p. 192, citing *Waters* v. *Bourhis* (1985) 40 Cal.3d 424 [220 Cal.Rptr. 666, 709 P.2d 469].)[9]

Because we decide this question on the different grounds discussed, we need not, and do not, adopt the Court of Appeal's rationale. Similarly, we need not, and do not, adopt the County's suggestion that the scope of MICRA should be viewed expansively as necessarily limiting *all* awards of noneconomic damages against a hospital for violations of EMTALA, including claims that do not involve conduct constituting "professional negligence." As discussed, the court's task in determining whether Civil Code section 3333.2 applies to a particular kind of EMTALA claim, such as a claim for failure to stabilize, properly involves examining the legal theory underlying the particular claim and the nature of the conduct challenged to determine whether, under California law, it would constitute "professional negligence" subject to Civil Code section 3333.2.

## IV

For the foregoing reasons, we conclude that damages awarded to Barris under EMTALA were properly subject to reduction pursuant to Civil Code

---

[9]In *Waters*, the plaintiff brought claims against her psychiatrist for sexual misconduct, based on theories of professional negligence and intentional tort. (*Waters* v. *Bourhis, supra,* 40 Cal.3d at pp. 433, 437.) We observed that the intentional tort claim was "of course, . . . not subject to . . . the $250,000 limit on noneconomic damages." (*Id.* at p. 437; see also *Noble* v. *Superior Court* (1987) 191 Cal.App.3d 1189, 1190 [237 Cal.Rptr. 38] [concluding, based on legislative history, that tolling provisions under MICRA "apply only to negligence causes of action [against a health care provider] and not to those based upon intentional torts"]; *Review of Selected 1975 California Legislation* (1976) 7 Pacific L.J. 544, 557 ["[I]t seems notable that the legislature chose to specifically regulate [under MICRA] only those actions brought upon a theory of 'professional negligence' . . . . Hence, a 'malpractice' action brought on a . . . non-negligence theory would apparently be without the ambit of this legislation."].)

section 3333.2, which imposes a cap of $250,000 on the liability of a health care provider for noneconomic damages in an action based on professional negligence. Accordingly, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Werdegar, J., and Brown, J., concurred.

**BAXTER, J.,** Concurring.—The question here is whether the $250,000 limit on noneconomic damages under California's Medical Injury Compensation Reform Act (MICRA) (Civ. Code, § 3333.2) applies to a cause of action for failure to stabilize an emergency medical condition in violation of the federal Emergency Medical Treatment and Active Labor Act (EMTALA) (42 U.S.C. § 1395dd(b)). The majority answer the question in the affirmative because "[t]he trier of fact must, under EMTALA as in a medical negligence claim, consider the prevailing medical standards and relevant expert medical testimony to determine whether material deterioration of the patient's condition was reasonably likely to occur." (Maj. opn., *ante*, at p. 114.) While I also conclude that MICRA is applicable to plaintiff's EMTALA action, I do so on a different basis.

EMTALA imposes two limited duties of care upon hospitals that have both a Medicare provider agreement and an emergency department. First, if any individual comes to the emergency department requesting examination or treatment, the hospital "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists."[1] (42 U.S.C. § 1395dd(a).) Second, as relevant here, if the hospital "determines that the individual has an emergency medical condition," it must provide, "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." (*Id.*, § 1395dd(b)(1)(A).)[2] Recognizing that personal injury may result directly from a hospital's failure to provide such care, Congress authorized the filing of civil actions for the recovery of damages subject to state law limitations on damages: "Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement [under EMTALA] may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." (42 U.S.C. § 1395dd(d)(2)(A).)

---

[1]As the majority note, most federal courts interpret the statutory phrase, "appropriate medical screening," to refer to *uniform* medical screening. (Maj. opn., *ante*, at p. 111, fn. 4.)

[2]If the individual has an emergency medical condition which has not been stabilized, the hospital may not transfer the individual unless other statutory criteria are fulfilled. (42 U.S.C. § 1395dd(b)(1)(B).)

In California, MICRA places a $250,000 limit on the ability of an injured plaintiff to recover damages for noneconomic losses "[i]n any action for injury against a health care provider based on professional negligence." (Civ. Code, § 3333.2, subds. (a), (b).) For purposes of MICRA, " '[p]rofessional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (Civ. Code, § 3333.2, subd. (c)(2).)

In my view, a hospital's demonstrated failure to act in accordance with EMTALA is, in and of itself, "a negligent . . . omission to act by a health care provider in the rendering of professional services" under the MICRA definition of professional negligence. (Civ. Code, § 3333.2, subd. (c)(2).) As I see it, any injury action based on a hospital's noncompliance with EMTALA's medical screening requirement or its provision for medically necessary stabilization treatment within the hospital's particular capabilities is an action based on professional negligence within the contemplation of MICRA.

Unlike the majority, then, I conclude, as a general matter, that any action against a hospital for a violation of EMTALA's duty of care provisions qualifies as an action based on professional negligence subject to MICRA, without regard to whether the particular claim entails consideration of the prevailing medical standards of care generally associated with a malpractice action. (Cf. *Power* v. *Arlington Hosp. Ass'n* (4th Cir. 1994) 42 F.3d 851, 861 [concluding that an EMTALA claim based on alleged disparate medical screening by a hospital was subject to Virginia's cap on medical malpractice damages even though the claim did not allege a breach of the prevailing standard of care].)

Chin, J., concurred.