[No. B133608. Second Dist., Div. One. Apr. 23, 2001.]

SANDRA PERRY, Plaintiff and Respondent, v.
WILLIAM SHAW et al., Defendants and Appellants.

## COUNSEL

Garcia, Emmons, Maranga & Morgenstern, Joseph G. Emmons; Greines, Martin, Stein & Richland, Martin Stein and Jennifer L. King for Defendants and Appellants.

Thelen Reid & Priest, Curtis A. Cole and Kenneth R. Pedroza for California Medical Association, California Dental Association and California Healthcare Association as Amici Curiae on behalf of Defendants and Appellants.

Fogel, Feldman, Ostrov, Ringler & Klevens, Larry R. Feldman, Jan G. Levine and David Bricker for Plaintiff and Respondent.

## OPINION

**VOGEL (Miriam A.), J.**—In 1972, our Supreme Court held that when a patient gives permission to a doctor to perform one type of surgical procedure but the doctor performs a substantially different operation, "the requisite element of deliberate intent to deviate from the consent given is present"

and a battery has been committed. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 239-240 [104 Cal.Rptr. 505, 502 P.2d 1].)

In 1975, our Legislature enacted the Medical Injury Compensation Reform Act (MICRA), substantially changing the law governing medical malpractice actions. Among other things, the Legislature imposed a $250,000 limitation on noneconomic damages in any action "based on professional negligence," with "professional negligence" defined as "a negligent act or omission to act by a health care provider in the rendering of professional services . . . ." (Civ. Code, § 3333.2, subds. (a), (c)(2).)[1]

In 1985, our Supreme Court held that when a plaintiff proceeds on both non-MICRA and MICRA causes of action and obtains a recovery that may be based on a non-MICRA theory, another MICRA statutory limitation does not apply. (*Waters v. Bourhis* (1985) 40 Cal.3d 424, 437-438 [220 Cal.Rptr. 666, 709 P.2d 469].)

In 1987, Division Five of our court held that the MICRA definition of "professional negligence" in another MICRA statute was "a deliberate choice" by the Legislature to exclude intentional torts, including battery. (*Noble v. Superior Court* (1987) 191 Cal.App.3d 1189, 1191-1194 [237 Cal.Rptr. 38].)

In other contexts, the Supreme Court has applied an expansive definition to the MICRA definition of "professional negligence," but it has not done so in the context of section 3333.2. To the contrary, our high court has said that the meaning of " 'based on professional negligence' [may] vary depending upon the legislative history and 'the purpose underlying each of the individual statutes.' " (*Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 115-116 [83 Cal.Rptr.2d 145, 972 P.2d 966].) We take the Supreme Court at its word and hold in this case that where, as here, a common law battery—something more than a "technical battery"—has been proved, the limitation imposed by section 3333.2 does not apply.

## FACTS

Following a very substantial loss of weight, Sandra Perry asked William Shaw, M.D., to surgically remove excess skin from her arms, back, thighs and stomach. During one office visit, they discussed a breast enlargement procedure in which muscle is moved from the back to the breasts, but Ms. Perry told Dr. Shaw she did not want that procedure. During another office visit, they talked about a breast-lifting procedure designed to lift but not

---

[1]Undesignated section references are to the Civil Code.

enlarge the breasts, but Ms. Perry told Dr. Shaw she "had definitely decided not to have any breast surgery at that time." At the hospital, Ms. Perry was asked to sign a form that included a consent to the breast-lifting procedure. Ms. Perry twice refused to sign the form and only changed her mind after she was medicated, taken to the operating room, and reassured by Dr. Shaw that he would not perform breast surgery.[2]

Ms. Perry awoke to discover that, in addition to the skin removal procedures, Dr. Shaw had performed a breast enlargement procedure by moving tissue flaps from the sides of her chest into her breasts. To her shock and dismay, Dr. Shaw had substantially augmented her breasts (from a 34B to a 40DD), making them "many, many times bigger" than they had been. When Ms. Perry questioned Dr. Shaw, he told her that although she might then be upset, she would be happy within a year—after one or two additional surgeries for minor revisions.

Ms. Perry sued Dr. Shaw and the Regents of the University of California (collectively Dr. Shaw), alleging both medical negligence and battery. Dr. Shaw answered, alleging that Ms. Perry's noneconomic damages for both claims were limited to $250,000 by section 3333.2. A jury rejected Dr. Shaw's testimony and returned special verdicts in favor of Ms. Perry, finding that Dr. Shaw was negligent, that he had committed a battery, and that both had caused Ms. Perry's injury (but that Ms. Perry was not entitled to punitive damages). The jury awarded Ms. Perry $59,000 for medical expenses (past and future) and $1,030,000 for her noneconomic damages (past and future). The trial court denied Dr. Shaw's motion to reduce the noneconomic damage award to $250,000 (and later denied his motion for a new trial made on the same ground) and entered judgment in favor of Ms. Perry. Dr. Shaw appeals.

## DISCUSSION

Dr. Shaw contends section 3333.2 applies to Ms. Perry's entire noneconomic damage award "because both her medical malpractice and battery claims were based on a single course of conduct constituting professional negligence as defined by that statute." We disagree.

### A.

As relevant, section 3333.2 provides: "(a) In any action for injury against a health care provider *based on professional negligence*, the injured plaintiff

---

[2]In the context of this case, it is unnecessary for us to decide whether "consent" obtained under these circumstances could ever constitute informed consent.

shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other non-pecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed . . . $250,000 . . . . [¶] (c) . . . . [¶] (1) 'Health care provider' [includes doctors and hospitals]. [¶] (2) *Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services*, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (Italics added.)

## B.

In *Cobbs v. Grant, supra,* 8 Cal.3d 229, our Supreme Court held that where "a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery. . . . [¶] . . . [W]hen an undisclosed potential complication results, the occurrence of which was not an integral part of the treatment procedure but merely a known risk, the courts are divided on the issue of whether this should be deemed to be a battery or negligence. . . . California authorities have favored a negligence theory. . . . [¶] Dean Prosser surveyed the decisions in this area and concluded, 'The earliest cases treated this as a matter of vitiating the consent, so that there was liability for battery. Beginning with a decision in Kansas in 1960 . . . , it began to be recognized that this was really a matter of the standard of professional conduct . . . . [T]he prevailing view now is that the action . . . is in reality one for negligence in failing to conform to the proper standard . . . .' . . .

"Although this is a close question, either prong of which is supportable by authority, the trend appears to be towards categorizing failure to obtain informed consent as negligence. That this result now appears with growing frequency is of more than academic interest; it reflects an appreciation of the several significant consequences of favoring negligence over a battery theory. . . . [M]ost jurisdictions have permitted a doctor in an informed consent action to interpose a defense that the disclosure he omitted to make was not required within his medical community. *However, expert opinion as to community standard is not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching absent consent. Moreover a doctor could be held liable for punitive damages under a battery count, and if held liable for the intentional tort of battery he might not be covered by his malpractice insurance.* . . .

■ "*We agree with the majority trend. The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present.* However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. *In that situation the action should be pleaded in negligence.*" (*Cobbs v. Grant, supra,* 8 Cal.3d at pp. 239-241, italics added, citations omitted; see also Prosser & Keeton, The Law of Torts (5th ed. 1984) § 18, p. 119 ["With the patient unconscious under an anaesthetic, and unable to be consulted, the mere desirability of the operation does not protect the surgeon, who becomes liable for battery—which . . . renders quite immaterial any question of whether he has complied with good professional practice"].)

■ In our case, Dr. Shaw performed an operation to which Ms. Perry did not consent. He committed a battery. We agree with Ms. Perry that, as a result, Dr. Shaw's liability is greater than it would have been for the sort of "technical battery" distinguished by the court in *Cobbs v. Grant.*

### C.

■ In *Noble v. Superior Court, supra,* 191 Cal.App.3d 1189, Division Five of our court held that the tolling provisions of Code of Civil Procedure section 364, subdivision (d), apply only to negligence causes of action. Under section 364, subdivision (a), an action based upon a health care provider's "professional negligence" may not be commenced unless the defendant has been given at least 90 days' prior notice of the plaintiff's intention to commence the action. If the notice of intent is served within 90 days of the end of the applicable period of limitations, "the time for the commencement of the action shall be extended 90 days from the service of the notice." (Code Civ. Proc., § 364, subd. (d).) The 90-day period is thus tacked on to the limitations period. (*Noble v. Superior Court, supra,* 191 Cal.App.3d at p. 1191.) In *Noble,* the plaintiff signed a consent form authorizing only an "excision of lymph node" to determine whether she had a certain form of cancer, but the doctor also severed and blocked a major nerve in order to alleviate the effects of an unrelated soft-tissue injury. Within the 90-day period covered by subdivision (d) of section 364, the plaintiff sued the doctor for both negligence and battery. The doctor demurred to the battery cause of action, claiming it was barred by limitations.

On appeal, the plaintiff claimed that because her battery claim was based upon the same facts as her negligence causes of action, the tolling provision of section 364 applied to her entire complaint. (191 Cal.App.3d at pp. 1191-1192.) Division Five of our court disagreed:

"Having reviewed the copious legislative history of section 364, we conclude that the 90-day tolling provisions of that section apply only to negligence causes of action. [¶] Section 364 was enacted in 1975 as part of [MICRA]. . . . The goal of the Legislature was to reduce the number of medical malpractice actions filed, with the hope of a corresponding reduction in malpractice insurance rates. [¶] Our review of MICRA's legislative history reveals extensive lobbying from the medical community and their counsel, on the one hand, and the plaintiffs' bar on the other. Such lobbying efforts were no doubt responsible for the spirit of compromise evident in section 364, where the requirement that a plaintiff give 90 days' notice before filing suit . . . is balanced by subdivision (d), which extends the statute of limitations for the same period of time. [¶] Both section 364 and section 340.6, which sets forth the limitations period, apply to actions against a health care provider based upon the provider's alleged 'professional negligence,' which is defined as 'a negligent act or omission to act.' . . . The atmosphere in which MICRA was enacted, and a comparison of the above language to other provisions of the act, lead us to conclude that the words 'negligent' and 'negligence' were carefully chosen to apply only to causes of action based upon negligence.

"For example, section 1295, which governs arbitration provisions in medical services contracts, requires that such contracts state clearly that they are applicable to 'any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered. . . .' . . . In section 1295, the Legislature used the term 'medical malpractice' to include medical services which were negligently rendered and those which were 'unnecessary or unauthorized' (the traditional grounds for a battery cause of action). The language of section 1295 goes 'beyond mere negligence' and encompasses all theories which might be included in a 'medical malpractice' action. (See *Herrera* v. *Superior Court* (1984) 158 Cal.App.3d 255, 261 [204 Cal.Rptr. 553] . . . .)

"In contrast, the provisions of MICRA relating to the statute of limitations (§§ 340.6 and 364) use the more limiting terms 'professional negligence' and 'negligent act or omission to act.' We view this as a deliberate choice, consistent with MICRA's goal of reducing the number of medical malpractice actions filed. The Legislature specifically reduced the limitations period

for such actions from four to three years. Noble's contention that section 364, subdivision (d) expanded the limitations period for battery is inconsistent with the spirit, if not the letter, of MICRA.

"Noble's argument is based upon the premise that her cause of action for battery is merely an alternative theory based upon the same set of facts as her negligence causes of action. This argument is unpersuasive. As our Supreme Court noted in *Cobbs* v. *Grant* [, *supra,*] 8 Cal.3d 229 . . . , there are significant differences between the two theories, including the evidentiary burdens, the availability of punitive damages, and the applicable limitations period: '[M]ost jurisdictions have permitted a doctor in an informed consent [negligence] action to interpose a defense that the disclosure he omitted to make was not required within his medical community. However, expert opinion as to community standard is not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching absent consent. Moreover, a doctor could be held liable for punitive damages under a battery count, and if held liable for the intentional tort of battery he might not be covered by his malpractice insurance. [Citation.] . . .'

"The distinction between negligence and battery was not lost on our Supreme Court, and we do not believe it was lost on the Legislature when it enacted section 364 as a limited exception to the statute of limitations for 'professional negligence.' Had the Legislature intended section 364, subdivision (d), to extend to causes of action based upon other theories which the plaintiff might wish to include in the complaint, it could have used language which reflected that intent. It did not." (*Noble v. Superior Court, supra,* 191 Cal.App.3d at pp. 1192-1194, citation, fn. & italics omitted.)

*Noble*'s narrow reading of "professional negligence" is supported by its analysis of the legislative intent underlying Code of Civil Procedure section 364. We therefore turn to the legislative history of section 3333.2.[3]

---

[3]*Noble* has never been overruled, disapproved, or even criticized. In *Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 188 [10 Cal.Rptr.2d 208, 832 P.2d 924], our Supreme Court held that Code of Civil Procedure section 425.13, a non-MICRA statute imposing procedural limitations on punitive damage claims in actions for damages "arising out of the professional negligence" of health care providers (*not actions based on professional negligence, as in section 3333.2*), is not "limited to causes of action alleging professional negligence." In *Barris v. County of Los Angeles, supra,* 20 Cal.4th 101, 115-116, where the issue was whether the section 3333.2 cap applied to an award for negligence arising out of a violation of the Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395dd), our Supreme Court reminded us that it had "not previously held that MICRA applies to intentional torts. Nor does *Central Pathology*, which involved a non-MICRA provision, so hold. . . . *Central Pathology* did not purport to define the meaning

## D.

■ In the declining economy of the early 1970's, California was in the middle of a medical malpractice crisis. Insurance carriers were concerned that fewer policies would be written and, at the same time, that the number of medical malpractice claims was escalating (as was the amount awarded for those claims). When the carriers increased their rates, doctors and other health care providers cancelled or reduced their coverage. Some limited their practices by abandoning high-risk specialties and others moved out of state. There were concerns that doctors who continued in practice would increase the fees charged to their patients, that injured patients would be unable to collect judgments, and that the availability of affordable medical care was threatened. (Arentz, *Defining "Professional Negligence" After Central Pathology Service Medical Clinic v. Superior Court: Should California's Medical Injury Compensation Reform Act Cover Intentional Torts?* (Spring 1994) 30 Cal. Western L.Rev. 221, 221-224, 252 (hereafter Arentz); Finkelstein, *California Civil Code Section 3333.2 Revisited: Has it Done Its Job?* (July 1994) 67 So.Cal. L.Rev. 1609, 1609-1613 (hereafter Finkelstein).)

MICRA was our Legislature's response to this crisis. As adopted in 1975, the idea was to reduce malpractice judgments in order to reduce insurance rates, thereby ensuring available and affordable health care. To those ends, several substantial changes were made in the law governing medical malpractice actions. The period of limitations during which a medical malpractice action could be brought was limited. (Code Civ. Proc., § 340.5.) The collateral source rule was abolished. (§ 3333.1.) Periodic payments of future damages were allowed without the plaintiff's consent. (Code Civ. Proc., § 667.7.) Contingency fee arrangements were regulated. (Bus. & Prof. Code, § 6146.) Arbitration clauses in medical services contracts were authorized. (Code Civ. Proc., § 1295.) And, "perhaps most significantly," a $250,000 cap was placed on noneconomic losses by the enactment of section 3333.2. (Arentz, *supra*, 30 Cal. Western L.Rev. at pp. 221-222; Finkelstein, *supra*, 67 So.Cal. L.Rev. at p. 1614; and see *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 158-159 [211 Cal.Rptr. 368, 695 P.2d 665] [by placing a ceiling of $250,000 on the recovery of noneconomic damages, section 3333.2 is rationally related to the objective of reducing the costs of malpractice defendants and their insurers]; *Western Steamship Lines, Inc. v.*

of the term 'professional negligence' as used in MICRA. . . . Rather, *Central Pathology* emphasized that the scope and meaning of the phrases 'arising from professional negligence' and 'based on professional negligence' could vary depending upon the legislative history and 'the purpose underlying each of the individual statutes.' " *Barris* left the question unanswered. (See also *Delaney v. Baker* (1999) 20 Cal.4th 23, 39 [82 Cal.Rptr.2d 610, 971 P.2d 986] ["The *Central Pathology* court made clear that it was not deciding the meaning of the term 'professional negligence' used in MICRA."].)

*San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 112 [32 Cal.Rptr.2d 263, 876 P.2d 1062] [MICRA reflects a strong public policy to contain the costs of malpractice insurance by controlling or redistributing liability for damages, thereby maximizing the availability of medical services].)

The cap on noneconomic damages is an integral part of MICRA. In medical malpractice litigation, noneconomic damages typically account for a large part of a total damage award and, therefore, a large part of the insurance carriers' expense. Accordingly, the Legislature adopted section 3333.2 "to calm insurance companies and assure them that they would not have to face huge pain and suffering payments[,] . . . to induce insurance companies to reduce their premiums[, and] to prevent plaintiffs and their lawyers from inflating damage awards." (Finkelstein, *supra,* 67 So.Cal. L.Rev. at p. 1614; see also Arentz, *supra,* 30 Cal. Western L.Rev. at pp. 221-222.) As one commentator has summed it up, "the Legislature's intended goal was to bring down premiums so that doctors could continue to practice medicine in California, and charge reasonable prices." (Finkelstein, *supra,* at p. 1614.)

E.

■ But there is nothing in the legislative history generally, or with regard to section 3333.2 specifically, to suggest that the Legislature intended to extend the $250,000 limitation to intentional torts.[4] As noted at the outset, *Cobbs v. Grant* was decided *three years before MICRA was enacted,* and the Legislature therefore knew when it defined "professional negligence" that there existed a species of battery that our highest court had said was *not negligence.* In that context, the only rational conclusion is "that the words 'negligent' and 'negligence' were carefully chosen to apply only to causes of action based upon negligence." (*Noble v. Superior Court, supra,* 191 Cal.App.3d at p. 1192; see also *Flores v. Natividad Medical Center* (1987) 192 Cal.App.3d 1106, 1114 [238 Cal.Rptr. 24] ["MICRA does not apply to the cause of action against the State for failure to summon medical aid"]; *Baker v. Sadick* (1984) 162 Cal.App.3d 618, 622 [208 Cal.Rptr. 676].)

If section 3333.2 is in fact the most significant limitation created by MICRA, it is also one of the most Draconian. When as a matter of legislative fiat the courts are required to reduce awards of noneconomic damages to $250,000 without regard to the result of a health care provider's negligence—notwithstanding brain damage, paralysis, and other equally devastating injury—the scope of that fiat must be limited to its terms. By its plain

---

[4]Although we sometimes refer to "intentional torts" generally (the common shorthand phrase adopted by the literature and the cases discussing MICRA), we emphasize that our holding is limited to the type of battery that occurred in this case.

language, the cap imposed by section 3333.2 applies only in actions "based on professional negligence," not (like Code of Civil Procedure section 425.13) to actions for "damages arising out of professional negligence." Whatever argument there may be to support a broad construction of "arising out of," we do not think it applies to a statute in which those words were not used. (See also *Herrera v. Superior Court* (1984) 158 Cal.App.3d 255 [204 Cal.Rptr. 553]; *Hedlund v. Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063].) As Ms. Perry points out, there is nothing in the legislative history of MICRA or section 3333.2 to suggest the Legislature intended to exempt intentional wrongdoers from liability by treating such conduct as though it had been nothing more than mere negligence.

### F.

Dr. Shaw contends that, at a minimum, he must be entitled to an allocation of the noneconomic damages between negligence and battery. We disagree.

In *Waters v. Bourhis, supra*, 40 Cal.3d 424, the defendant, a lawyer, had represented the plaintiff in an earlier action against a psychiatrist in which there had been claims alleging negligence, breach of a duty of good faith, and intentional or reckless infliction of emotional distress, all based on allegations of sexual misconduct by the psychiatrist. (*Id.* at p. 429.) In the legal malpractice action, the plaintiff claimed the contingency fee obtained by the defendant in settlement of the earlier action exceeded the maximum fee permitted by Business and Professions Code section 6146; the lawyer claimed the client's recovery in the earlier suit was based on intentional misconduct engaged in for personal (not professional) motives, and that his fee was not limited by Business and Professions Code section 6146 because such an action does not fall within the category of "professional negligence" actions to which MICRA was intended to apply. (40 Cal.3d at p. 433.)

The Supreme Court found both MICRA and non-MICRA claims, noted that the earlier action had been resolved by settlement without an allocation between the two claims, and held that when a plaintiff "knowingly chooses to proceed on both non-MICRA and MICRA causes of action, and obtains a recovery that may be based on a non-MICRA theory, the limitations of section 6146 should not apply." (*Waters v. Bourhis, supra*, 40 Cal.3d at p. 437.)

We recognize the differences between *Waters* and the case now before us but conclude that its rule ought to apply here. The jury found that Dr. Shaw's negligence as well as his battery caused Ms. Perry's noneconomic damages.

This is not, as Dr. Shaw suggests, a matter of separate items of compensible damages recoverable when shown by distinct and independent evidence. (Cf. *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1159 [17 Cal.Rptr.2d 608, 847 P.2d 574].) It is one item of damage with two concurrent and legally overlapping causes—negligence and battery. It is emotional distress that was caused by the unwanted breast enlargement. (*Flores v. Natividad Medical Center, supra,* 192 Cal.App.3d at p. 1116 [where MICRA and non-MICRA claims have been pled and proved, and where the non-MICRA claim could have provided a basis for the jury's finding of "professional negligence," this "does not render the true nature of the action . . . one for professional negligence"].) The legal label placed on Dr. Shaw's wrong does not affect the nature or extent of Ms. Perry's distress or pain or suffering.[5]

## G.

We reject Dr. Shaw's suggestion that our distinction between battery and negligence defeats MICRA's policy of cost containment and threatens its broader purpose by resurrecting the pre-MICRA instability associated with unlimited noneconomic damages, thereby increasing the overall cost of malpractice insurance to account for these larger recoveries. (See *Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 216 [87 Cal.Rptr.2d 187, 980 P.2d 895].) The fact that this issue comes before us for the first time in 2001 speaks volumes against such a conclusion—in the 26 years that MICRA has been on the books, this is apparently the first time this issue has

---

[5]In any event, Ms. Perry's entire case was based on her claim of battery. In his opening statement, Ms. Perry's lawyer told the jurors that "this case is not about a woman who had plastic surgery and is unhappy because it did not turn out the way she wanted. . . . The issue here is whether Ms. Perry consented to the procedure that was performed on her by [Dr. Shaw]." At trial, Ms. Perry and her medical experts confirmed that her case was premised on her lack of consent to the breast surgery, and she did not offer any evidence to suggest that the surgery performed by Dr. Shaw was negligently performed. Indeed, the court told the jurors that, although it was irrelevant to the informed consent issue, uncontroverted evidence had established that the surgery performed by Dr. Shaw was within the standard of care. In closing argument, Ms. Perry's lawyer explained that although two causes of action were alleged, there was but a single issue for the jurors' consideration: "The issue here is not whether [Dr. Shaw] did the surgery correctly. The issue here is not whether he improved [Ms. Perry's] looks . . . . The only issue, the very simple issue for you to decide is whether, in fact, Dr. Shaw had consent to do what he did. The simple answer is: No, he did not." That negligence was also pleaded and proved shows only that Ms. Perry's lawyer was understandably unable to predict the jury's verdict. Another reason might have been the availability of insurance coverage for the defendants, but we express no view about that issue. (See *Podiatry Ins. Co. of America v. Isham* (1992) 65 Wash.App. 266, 260 [828 P.2d 59]; *South Carolina Medical Malpractice Liability Ins. Joint Underwriting Ass'n v. Ferry* (1987) 291 S.C. 460, 465 [354 S.E.2d 378]; cf. *Allstate Ins. Co. v. Overton* (1984) 160 Cal.App.3d 843, 848-850 [206 Cal.Rptr. 823].)

reached this level. If the floodgates are there, they are holding back droplets, not a deluge.[6]

The jury believed that Dr. Shaw performed the breast enlargement without Ms. Perry's consent and contrary to her express wishes or, in legal terms, that Dr. Shaw is liable for the intentional tort of battery. Based on those findings, the jury awarded about $1 million in noneconomic damages. We see no reason to reduce that amount and therefore affirm the judgment.

DISPOSITION

The judgment is affirmed. Ms. Perry is entitled to her costs of appeal.

Ortega, Acting P. J., and Mallano, J., concurred.

The petition of both respondent and appellants for review by the Supreme Court was denied August 22, 2001. Chin, J., did not participate therein.

---

[6]As the trial court put it: "This court is persuaded that there . . . has never been a problem of runaway jury verdicts in battery actions. Just never heard of it. It isn't on the scene. It doesn't present itself as an item to be addressed by the Legislature, so I think it was not addressed by the Legislature. I think battery was simply not considered as the kind of action that falls within the coverage of the MICRA cap."