Filed 5/26/23

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERN COUNTY HOSPITAL AUTHORITY, | F083743 |
| Plaintiff and Respondent, | (Super. Ct. No. BCV-20-102979) |
| v. | |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION et al., | **OPINION** |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Kern County. David R. Lampe, Judge.

Rob Bonta, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Maria G. Chan and Van Kamberian, Deputy Attorneys General, for Defendants and Appellants.

Zimmer & Melton, T. Mark Smith and Justin L. Thomas for Plaintiff and Respondent.

-ooOoo-

As four medically comprised inmates who required skilled nursing care were approaching their parole dates, the California Department of Corrections and

Rehabilitation (CDCR) unsuccessfully attempted to locate skilled nursing facilities that would accept them after they were paroled. When their parole dates arrived, the CDCR, believing it had no other option, paroled them to Kern County and transported them to the emergency department at Kern Medical Center (KMC), a licensed general acute care hospital. Kern County Hospital Authority (Hospital Authority), which operates KMC, sought a peremptory writ of mandate and injunction against the CDCR and its Secretary, Kathleen Allison (collectively the Department or CDCR). The trial court granted the writ of mandate, which enjoins the Department from transferring additional parolees from any licensed CDCR medical facility to Hospital Authority's facilities without arrangements being made in advance for admission, absent a medical emergency.

The Department appeals, arguing it does not have a ministerial duty to obtain Hospital Authority's express consent before transporting parolees to KMC's emergency department. It further argues the injunction impermissibly requires it to imprison these parolees beyond their release dates and interferes with its parole-placement decisions. Although we find the injunction is overbroad and must be modified, we otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2016, the responsibility for placement of medically compromised parolees shifted from the Division of Adult Institutions to a different unit at the California Correctional Health Care Services (CCHCS). When attempting to place soon-to-be-paroled inmates who are medically compromised or need assistance with activities of daily living, the Department and CCHCS go through a utilization management process which includes contacting the inmates' families, the Veteran's Administration (if applicable), and skilled nursing facilities in the inmate's county of last legal residence.

If the Department and CCHCS staff are unable to find a skilled nursing facility willing to accept the inmate in the inmate's county of last residence, a Department attorney notifies county counsel and requests collaboration on a placement, while staff

2.

determine whether there is a safety net hospital in that county.  Staff locate available safety net hospitals by reviewing the Safety Net Institute's website; not every county has a safety net hospital.[1]  Safety net hospitals are hospitals that, by mission or mandate, provide care to a substantial share of vulnerable patients regardless of their ability to pay and provide medical screening and appropriate care as needed.  If a safety net hospital is not located in the parolee's county of last legal residence, the Department looks to the safety net hospital closest to that county using the list of safety net hospitals from the Safety Net Institute's website.

The Safety Net Institute is a trade organization which, according to CCHCS's Deputy Medical Executive of Clinical Operations, is a collective of 21 hospitals that receive funding for the indigent population.  While the deputy medical executive acknowledged safety net hospitals most likely were not the only hospitals in California that received funding to care for indigent people, she was not familiar with the various hospital networks and their funding.  The Department does not attempt to identify hospitals that receive public funds for the care of indigents; rather, it is the Department's practice to find safety net hospitals that already had been identified to serve the indigent population.

When parolees are sent to a medical facility, including a safety net hospital, the Department's practice is to send the parolee's medical history to the facility in advance of the parolee's arrival, and to inform the receiving facility of the date and time the parolee will be arriving.  Transportation to a receiving facility depends on the parolee's level of care.

---

[1]    There is neither a written policy requiring placement of parolees in safety net hospitals, nor a state law or regulation that lists such hospitals; rather, it is the Department's practice to attempt to place parolees in them.  The guidance to utilize safety net hospitals came from the Department's legal department and other executive entities.

*The Transfers to KMC*

Between August and December 2020, four medically compromised inmates were paroled from prison to Kern County.[2]  These parolees, who had been receiving inpatient medical care in prison,[3] had medical conditions requiring skilled nursing care, which the Department determined was the appropriate level of care.[4]  They needed help with activities of daily living and were unable to care for themselves.  While their conditions would become emergent without continuing ongoing medical care, they did not have acute medical needs.

Only one of the four parolees had been a Kern County resident before incarceration.  Before paroling the inmate from Kern County, staff contacted 17 facilities in Kern County unsuccessfully seeking a skilled nursing placement.[5]  A Department attorney emailed Kern County Counsel for placement assistance at KMC based on the presumption County Counsel represented KMC.  County Counsel responded that KMC was not county owned, and Kern County could not receive indigent patients from the Department as it did not own or control any hospitals or skilled nursing facilities.  County Counsel asked the attorney to "please discontinue your emailing of the attorneys at the Office of Kern County Counsel with notices of deposit of CDCR's indigent releases."

---

[2]     Each of the four parolees were required to register as sex offenders pursuant to Penal Code section 290.

[3]     Three of the parolees were housed at the California Health Care Facility, which is a prison that contains a licensed health facility known as a Correctional Treatment Center.  The fourth was on medical parole and housed at a skilled nursing facility in Sacramento.

[4]     Skilled nursing facilities can provide care that acute-care facilities cannot, including rehabilitation, occupational, educational, and life-living services.

[5]     Department staff and CCHCS staff are collectively referred to as staff.  CCHCS is not a party to this action.

A second parolee, whose last legal residence had been in Fresno County, was released after being on expanded medical parole, which is an alternate form of custody for medically incapacitated inmates who require 24-hour medical care and are approved to serve their sentence outside of a prison. (Pen. Code, § 3550, subd. (a).)[6] The facility where this individual was housed on medical parole declined the Department's request to accept him on regular parole. Staff contacted 12 skilled nursing facilities in Fresno County but could not secure a bed. A Department attorney contacted Fresno County Counsel for placement assistance, but was advised to contact the Fresno County probation department because such matters did not usually come through the County Counsel's office.

As for the other two parolees, whose last legal residences had been in Tulare County, staff contacted facilities in Tulare County – 15 facilities for one parolee and 18 facilities for the other – unsuccessfully seeking a skilled nursing placement. Tulare County Counsel was contacted for placement assistance, but apparently no response was received.

Unable to find a placement for these parolees at skilled nursing facilities, staff looked to place the parolees in the safety net hospital in the parolee's county of last legal residence or, if that county did not have a safety net hospital, in the closest county with such a hospital, to ensure they received the necessary care as required by law. KMC was determined to be the closest safety net hospital to the parolees' counties of last legal residence.[7] When KMC was notified one of the parolees whose last legal residence was

---

[6] Medical parole provides for the return to prison if the inmate's condition improves and does not affect eligibility for other forms of parole or release. (Pen. Code, § 3550, subds. (h) & (j).)

[7] At the time, staff believed Fresno County did not have a safety net hospital based on a review of the Safety Net Institute's website. The CCHCS Deputy Medical Executive of Clinical Operations stated in a declaration that a later review of Fresno Community Regional Medical Center's website showed CRMC is a safety net health care provider and while staff had no readily available way to determine this or the extent of

in Tulare County would be taken to its facility as the closest safety net hospital to the parolees' last residence, KMC's in-house counsel responded: "So there is no need to coordinate with our physicians as we do not have access to long term care at our facility. You can just dump him at the [emergency department] if you like. We will follow EMTALA [(Emergency Medical Treatment and Active Labor Act)] and do a medical screening and he will wait in our [emergency department] until we can find placement as we also must follow safe discharge laws."

The Hospital Authority operates KMC, which is a safety net hospital with an emergency department that by law must conduct a medical screening exam and stabilize all individuals presenting at their emergency department regardless of ability to pay. While KMC's emergency department handles a wide variety of patient issues, KMC does not, and is not licensed to, provide long-term or skilled nursing care.

When the Department paroled the four parolees, it transported them to KMC's emergency department.[8] KMC did not accept a transfer of the parolees or agree to admit them, and the Department did not arrange for their admission to KMC. The Department does not have a contract with KMC to transfer parolees requiring long term care to KMC. While the Department tries to find willing participants to take its patients, when no one will accept them, it notifies "hospitals that will receive them in the emergency department."

After evaluating each parolee, KMC admitted them, not because they met inpatient criteria for admission, but because they were unable to care for themselves. KMC provided medical services to the parolees. While Hospital Authority acknowledged the parolees needed to be placed in some type of medical facility, it did

safety net services CRMC provides, CRMC's safety net status would be reviewed in the future.

[8]    The parolees were transported on their release dates: August 27 and 30, 2020, September 18, 2020, and December 15, 2020.

not believe the hospital was the appropriate place for them.  KMC eventually found placement for three of the parolees at other facilities, while the fourth died.

***The Petition for Writ of Mandate***

Hospital Authority petitioned for a writ of mandate seeking an order requiring the Department to remove the parolees from KMC and place them elsewhere, such as on Department property, or at a safety net hospital that has the most capacity to provide long term care during the Covid-19 pandemic.  Hospital Authority alleged the Department abused its discretion by delivering parolees requiring long term care to KMC's emergency department even though Kern County was not the parolee's last county of residence without considering whether the location is in the public's best interest.

The trial court granted Hospital Authority's application for a temporary restraining order enjoining the Department from transferring, delivering, or transporting parolees to KMC except in an actual medical emergency.  The trial court subsequently granted a preliminary injunction enjoining the Department from transferring any prisoner or parolee who is under the care of any licensed Department medical facility upon parole to Hospital Authority's facility without its express agreement unless there is a bona fide medical emergency.  The trial court also issued an alternative writ and ordered a return on the writ.  The Department filed an answer to the petition and a return to the alternative writ, to which the Hospital Authority replied.

Following a hearing, the trial court granted the petition, finding the Hospital Authority met its burden that a permanent injunction should issue.  The trial court noted the parties and counsel conceded there were no disputed issues of fact material to the matter.  The trial court determined:  (1) the Department has a duty under Penal Code section 3003 to consider the parolees' safety; (2) the undisputed facts make clear the parolees "were first and foremost 'patients' of [the Department's] licensed medical facilities," which are not prisons but rather are licensed health facilities with a primary duty to their patients regardless of their status as prisoners or parolees; and (3) under

California Code of Regulations, title 22, section 79789, the Department "may not 'transfer' patients under its medical care without complying with its duty to provide admission to an appropriate health facility" and may not commit "illegal 'patient dumping' " by delivering patients to Hospital Authority's facility through its emergency department without Hospital Authority's prior agreement to accept admission.

The trial court issued the following peremptory writ of mandate: "The Court permanently enjoins transfer by [the Department] of any prisoner or parolee who is under care at any licensed CDCR medical facility upon parole to [Hospital Authority]'s facilities without [Hospital Authority]'s express agreement for the transfer, unless there is a bona fide medical emergency that requires emergency transport by ambulance through the Kern County emergency response system, where [Hospital Authority] is the designated receiving hospital emergency department at the time for that system."

## DISCUSSION

### *Writs of Mandate and Standard of Review*

"Code of Civil Procedure section 1085, providing for writs of mandate, is available to compel public agencies to perform acts required by law. [Citation.] To obtain relief, a petitioner must demonstrate (1) no 'plain, speedy, and adequate' alternative remedy exists [citation]; (2) 'a clear, present, ... ministerial duty on the part of the respondent'; and (3) a correlative 'clear, present, and beneficial right in the petitioner to the performance of that duty.' " (*People v. Picklesimer* (2010) 48 Cal.4th 330, 339–340; accord, *International Brotherhood of Teamsters, Local 848 v. City of Monterey Park* (2019) 30 Cal.App.5th 1105, 1111.) "A ministerial duty is an obligation to perform a specific act in a manner prescribed by law whenever a given state of facts exists, without regard to any personal judgment as to the propriety of the act." (*Picklesimer*, at p. 340; see *International Brotherhood of Teamsters, Local 848*, at p. 1111; *Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1186 (*Citizens*).)

8.

Since mandamus is a remedy to compel a public agency to comply with a ministerial duty, not to compel it to exercise its discretion in a particular manner, an action's classification as ministerial or discretionary is crucial to the ultimate question whether mandate lies. (*Citizens*, *supra*, 28 Cal.App.5th at p. 1186.) A duty is ministerial when the action is unqualifiedly required; " '[a] public entity has a ministerial duty to comply with its own rules and regulations where they are valid and unambiguous.' " (*Ibid.*) If the action is discretionary, however, mandate lies only to correct abuses of discretion. (*Ibid.*)

"When a court reviews a public entities' decision for an abuse of discretion, the court may not substitute its judgment for that of the public entity, and if reasonable minds may disagree as to the wisdom of the public entity's discretionary determination, that decision must be upheld. [Citation.] Thus, the judicial inquiry in an ordinary mandamus proceeding addresses whether the public entity's action was arbitrary, capricious or entirely without evidentiary support, and whether it failed to conform to procedures required by law." (*California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1443.)

"The reviewing court exercises independent judgment in determining whether the agency action was 'consistent with applicable law.' [Citation.] Where the issue is one of statutory interpretation, the question is one of law for the courts, which are the ' "ultimate arbiters" ' of statutory construction. [Citations.] Since we apply the same standard as the trial court, its determination is not binding on us." (*Association of Irritated Residents v. San Joaquin Valley Unified Air Pollution Control Dist.* (2008) 168 Cal.App.4th 535, 543; see *California School Bds. Assn. v. State Bd. of Education* (2010) 186 Cal.App.4th 1298, 1314 ["[i]ndependent review is required … where the issue involves statutory or regulatory construction, such as whether the agency's action was consistent with applicable law"].)

9.

" ' "Our fundamental task in construing" ' … any statute, ' "is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." … We begin as always with the statute's actual words, the "most reliable indicator" of legislative intent, "assigning them their usual and ordinary meanings, and construing them in context." ' [Citation.] If the words appear susceptible of more than one reasonable construction, we look to other indicia of legislative intent, bearing in mind the admonition that '[t]he meaning of a statute may not be determined from a single word or sentence' [citation] and that apparent 'ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' " (*People v. Pennington* (2017) 3 Cal.5th 786, 795.)

"Rules governing the interpretation of statutes also apply to interpretation of regulations. [Citation.] 'In interpreting regulations, the court seeks to ascertain the intent of the agency issuing the regulation by giving effect to the usual meaning of the language used so as to effectuate the purpose of the law, and by avoiding an interpretation which renders any language mere surplusage.' " (*Diablo Valley College Faculty Senate v. Contra Costa Community College Dist.* (2007) 148 Cal.App.4th 1023, 1037.) Where a statute empowers an administrative agency to adopt regulations, those regulations must be consistent and not conflict with the governing statute. (See *Ontario Community Foundations, Inc. v. State Bd. of Equalization* (1984) 35 Cal.3d 811, 816; Gov. Code, § 11342.2.)

***Legal Principles Concerning Medical Treatment and Parole***

The Department operates correctional treatment centers in its prisons to treat inmates in accordance with Health and Safety Code section 1250.[9] A correctional treatment center is "a health facility operated by [the Department] … that, as determined

---

[9] Undesignated statutory references are to the Health and Safety Code.

by the [State Department of Health Care Services], provides inpatient health service to that portion of the inmate population who do not require a general acute care level of basic services." (§§ 1250, subd. (j)(1), 100100, 100150.)[10] Section 1250, subdivision (j)(3) requires correctional treatment centers to "maintain written service agreements with general acute care hospitals to provide for those inmate physical health needs that cannot be met by the correctional treatment center."

The Legislature "created the correctional treatment center licensing category to ensure that inpatient medical services provided in California's correctional facilities met minimum health standards." (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 56 (*Morris*).) Correctional treatment centers may not be operated without a license. (*Ibid.*; § 1253.) Pursuant to the Legislature's direction, the State Department of Health Care Services has developed regulations governing correctional treatment centers, which cover all aspects of their management and operation; the regulations are found in chapter 12, title 22 of the California Code of Regulations.[11] (*Morris, supra,* 94 Cal.App.4th at p. 56.)

Regulation 79789 addresses patient transfers. It requires the licensee to "maintain written transfer agreements with one or more general acute care hospitals to make the services of those facilities accessible and to facilitate the transfer of patients." (Cal. Code Regs., § 79789(a).) It further provides: "No patient shall be transferred or discharged for purposes of effecting a transfer from a facility to another facility, unless arrangements

---

[10]    California Code of Regulations, title 22, section 79516 defines a correctional treatment center as "a health facility with a specified number of beds within a state prison … designated to provide health care to that portion of the inmate population who do not require general acute care level of services but are in need of professionally supervised health care beyond that normally provided in the community on an outpatient basis."

[11]    Undesignated references to regulations are to title 22 of the California Code of Regulations. To differentiate the applicable regulations from relevant statutes, we shall refer to various sections in the regulatory framework as "regulation." For example, California Code of Regulations, title 22, section 79789 will be identified as regulation 79789.

have been made in advance for admission to such a health facility." (*Id.*, § 79789(b).) Another regulation requires a transfer summary to "accompany or precede the inmate-patient upon transfer to another facility where continuing care will be provided." (*Id.,* § 79809.)[12]

The Department also has promulgated regulations concerning the provision of health care services at chapter 2 of title 15 of the California Code of Regulations. (Pen. Code, § 5058; Cal. Code Regs., tit. 15, § 3999.98 et seq.; *In re Cabrera* (2012) 55 Cal.4th 683, 688.) Those regulations require the Department to "perform each patient transfer in a manner that ensures continuity of care," and provide that "[t]ransfers of care shall be accomplished by verbal communication between sending and receiving care teams, with written documentation accompanying the patient." (Cal. Code Regs., tit. 15, § 3999.306(a) & (c).)[13] They further provide that for transfers to non-CDCR facilities on "[r]elease from custody," "[c]ustody staff shall notify health care staff of pending transfer via the Parole/Transportation List." (*Id.*, § 3999.306(c)(2)(B).)[14]

Department regulations also address health care treatment for parolees, which require health care staff to personally screen each patient prior to release to parole or discharge from a facility and alert the patient's parole agent regarding any current health

---

[12] An "inmate-patient" is defined as "an inmate who is receiving care and supervision in a correctional treatment center." (Cal. Code Regs., § 79537.) An "inmate, as used in the correctional treatment center regulations," is defined as "a detainee or offender who is under sentence to, or confined in, a prison, jail, or other correctional institution operated by the Department of Corrections …." (*Id.*, § 79535.)

[13] The regulations define a "patient" as "an inmate who is seeking or receiving health care services or who is assigned to a care team," and a "care team" as "an interdisciplinary group of health care professionals who combine their expertise and resources to provide care for a panel of patients." (Cal. Code Regs., tit. 15, § 3999.98.)

[14] The regulations define "health care staff" as "those persons licensed by the state to provide health care services, who are employed by the Department or are working under direct or indirect contract with the Department to provide health care services." (Cal. Code Regs., tit. 15, § 3999.98.)

12.

problems. (Cal. Code Regs., tit. 15, § 3999.432(a).) While "[h]ealth care for parolees shall normally be provided by private physician and community medical facilities, as desired by the parolee and at the parolee's own expense," when a parolee requires emergency medical, surgical, psychiatric, or dental care and community resources are not available or lack security to treat the parolee, arrangements may be made for the parolee's return to Department custody for emergency treatment. (*Id.*, § 3999.432(b) & (c); see Welf. & Inst. Code, § 17000 [requiring counties to "relieve and support" indigent persons]; *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 104-105 [Welf. & Inst. Code, § 17000 mandates the provision of medical care to indigents and imposes a mandatory duty on all counties to provide medically necessary care].)

The parolees at issue in this case were inmate-patients of the correctional treatment centers. But once they reached their parole dates, they were entitled to parole release. (Pen. Code, § 3000, subds. (a)(1) & (b)(1); Cal. Code Regs, tit. 15, §§ 3500(b), 3075.2(a)(1); *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 902 ["California's parole scheme gives rise to a cognizable liberty interest in release on parole"].) Offenders serving a determinate term must be released for a period of supervised parole once they serve their entire term, less applicable sentence credits, while those serving indeterminate sentences become eligible for parole consideration after serving minimum terms of confinement. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1078.) Once a release date is scheduled, the inmate must be released on that date, "except as otherwise provided by applicable law and regulations." (Cal. Code Regs., tit. 15, § 3075.2(a)(1).)

The Legislature has granted the Department discretion to determine the "specified terms and conditions of a given parole" (*McCarthy v. Superior Court* (1987) 191 Cal.App.3d 1023, 1028), and "exclusive jurisdiction and full discretion to determine a parolee's placement." (*City of Susanville v. Department of Corrections & Rehabilitation* (2012) 204 Cal.App.4th 377, 382 (*City of Susanville*).) If possible, a parolee is to be returned to the city that was the parolee's last legal residence prior to

13.

incarceration, but the Department retains discretion to return the parolee to another county or city "if that would be in the best interests of the public." (Pen. Code, § 3003, subds. (a) & (b).) In making its decision, the Department must consider five enumerated factors, including "[t]he need to protect the life or safety of … the parolee[.]" (Pen. Code, § 3003, subd. (b).)

Here, the Department attempted to find skilled nursing facilities in the parolees' last counties of residence before the parolees' scheduled release dates. When those efforts proved unsuccessful and the parolees' release dates arrived, the Department discharged the parolees from the correctional treatment centers and delivered them to KMC's emergency department. Although the parolees did not have emergent needs requiring emergency care, the Department reasoned KMC was required to provide medical screening and any appropriate treatment by the EMTALA (42 U.S.C. § 1395dd).

EMTALA prohibits hospitals that have entered into Medicare provider agreements "from inappropriately transferring or refusing to provide medical care to 'any individual' with an emergency medical condition. (*Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 108-109 (*Barris*).)[15]

Under the EMTALA, hospitals with emergency departments have two obligations: (1) to provide " 'an appropriate medical screening examination' " if an individual comes to the emergency department requesting examination or treatment; and (2) "if the hospital 'determines that the individual has an emergency medical condition,' it must provide 'within the staff and facilities available at the hospital' for 'such treatment as may be required to stabilize the medical condition' and may not transfer such a patient until the

---

[15]     "Although EMTALA was passed in response to concern by the Congress that hospitals were engaging in 'patient dumping' – i.e., refusing medical treatment or transferring indigent and uninsured patients from private to public hospitals to avoid the costs of treatment – it applies to all patients seeking emergency treatment, without regard to ability to pay or insurance." (*Barris, supra,* 20 Cal.4th at p. 109, fn. 2.)

condition is stabilized or other statutory criteria are fulfilled." (*Barris, supra,* 20 Cal.4th at p. 109, citing 42 U.S.C. § 1395dd(a), (b) & (c).)[16] If an individual's emergency medical condition has not been stabilized, a hospital may not transfer the individual unless, among other things, the transfer is an "appropriate transfer," which requires the receiving facility to (1) have available space and qualified personnel to treat the individual, and (2) agree to accept the transfer and provide appropriate medical treatment. (42 U.S.C. § 1395dd(c)(2)(B).)

***Ministerial Duty***

The issue here is whether the Department has a ministerial duty to refrain from discharging parolees who need continued skilled nursing care from the correctional treatment centers until it can locate a medical facility that consents to admit them. The Department contends once inmates who are correctional treatment center patients reach their parole release date, they become parolees, and if the Department has not located a non-CDCR medical facility willing to admit them before their parole dates, once those dates arrive, it has no choice but to transport them to the emergency department of a safety net hospital in the county to which they are being paroled. Hospital Authority

---

[16]      EMTALA defines the term "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in … [¶] … placing the health of the individual … in serious jeopardy, [¶] … serious impairment to bodily functions, or [¶] … serious dysfunction of any bodily organ or part." (42 U.S.C. § 1395dd(e)(1)(A).) It defines "to stabilize" as meaning "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from [the] facility[.]" (42 U.S.C. § 1395dd(e)(3)(A).)

A similar California statute requires hospitals with emergency departments to provide "[e]mergency services and care" to "any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness[.]" (Health & Saf. Code, § 1317, subd. (a).)

counters the parolees remain patients of the correctional treatment centers, therefore regulation 79789 requires the Department to obtain consent from KMC, as the receiving medical facility, before transferring the parolees there.

As stated above, regulation 79789(b) provides that "[n]o patient shall be transferred or discharged for purpose of effecting a transfer from a facility to another facility, unless arrangements have been made in advance for admission to such a health facility." It is undisputed the Department did not comply with regulation 79789(b) when transferring the parolees to KMC, as it did not arrange for their admission to KMC before dropping them off at KMC's emergency department. The Department, however, maintains regulation 79789(b) is inapplicable because it covers only inmate-patients, not parolees, and does not require a receiving facility's consent before taking the parolees to the emergency department.

On the first point, the Department contends reading regulation 79789 as applying to parolees impermissibly enlarges the scope of section 1250, which allows correctional treatment centers to provide inpatient health services to a segment of the "inmate population." (§ 1250, subd (a).) But the correctional treatment centers do not necessarily treat only inmates. As Hospital Authority points out, correctional treatment centers have the option of providing perinatal services, which allows the correctional treatment center to provide care for infants, who if born without abnormalities that impair function or threaten life may be retained at the correctional treatment center for 24 hours and requires development of admission policies that include infants delivered prior to the mother's admission. (Cal. Code Regs., §§ 79703, 79723(a)(2) & (b)(2).) Moreover, the correctional treatment center may arrange for the provision of neonatal care outside the treatment center under contractual agreement with a general acute care hospital. (Cal. Code Regs., § 79723(a)(1).) Regulation 79789's transfer provision would necessarily apply to infants, who are correctional treatment center patients, and require the Department to make advance arrangements for the infant's admission to the hospital.

16.

Thus, regulation 79789 appears to be a general transfer regulation that applies to all patients of correctional treatment services, which is further evidenced by the use of the term "patient" rather than the defined terms of "inmate-patient" or "inmate." (Cal. Code Regs., §§ 79535 [defining "inmate"], 79537 [defining "inmate-patient"], 79789(b).) While the applicable regulations do not mention parolees or define that term, and other provisions of the correctional treatment center regulations refer to either inmate-patients or patients or use the two terms interchangeably in the same regulation,[17] the regulations do not indicate that an inmate ceases to be a patient of the correctional treatment center simply because the inmate's status changes to that of parolee. To hold otherwise would mean, for example, that inmates who for whatever reason remain in the correctional treatment center past their release date would lose whatever protections are provided to correctional treatment center patients.

For this reason, even if regulation 79789 used the term "inmate-patient" rather than "patient," and was intended to apply to inmate-patients, the regulation still would apply to inmates whose status changes to parolees and who remain in the correctional treatment center for care or treatment.[18] As Hospital Authority points out, the

---

[17] The Department cites to regulations that: (1) refer only to "inmate-patient" (Cal. Code Regs., §§ 79799 [inmate-patient rights], 79805 [inmate-patient health record], 79815 [inmate-patient identification], 79801 [clinical restraints of inmate-patients]); (2) use only the term "patient" (*id.*, §§ 79789 [transfer], 79731 [outpatient surgery], 79813 [custodial personnel]); and (3) others that use both terms (*id.*, §§ 79799 [inmate-patient's rights] and 79805 [inmate-patient health record content].)

[18] The Department cites to the statement of reasons for the correctional treatment center regulations to support the conclusion that regulation 79789 applies only to inmates, which note correctional treatment centers were created to raise the health care of inmates of jails, prisons, and other detention facilities to community health care standards. The statement of reasons states regulation 79789 is necessary to implement section 1250, subdivision (j)(3)'s requirement to maintain written service agreements with general acute care hospitals "to make services … available to inmate-patients," to "facilitate transfers of inmate-patients to general acute care hospitals," and to ensure

requirement to make arrangements for admission before transferring a patient to another facility applies to other types of health facilities. For example, a general acute care hospital may not transfer or discharge a patient solely for the purposes of effecting a transfer to another health facility unless, among other things, "[a]rrangements have been made in advance for admission to such health facility." (Cal. Code Regs., § 70717(f); see *id*., §§ 71517(e) [acute psychiatric hospital may not transfer inpatient to another health facility "unless arrangements have been made in advance for admission to such health facility"]; 77113(e) [same for psychiatric health facilities], 79325(h) [same for chemical dependency recovery hospital]; 73315(i) [intermediate care facilities must "make arrangements" to transfer a patient requiring service which are not considered intermediate services].)

Thus, the transfer requirement is not unique to correctional treatment centers but applies to all health facilities. This is to protect the patient by ensuring the receiving facility can accommodate and care for the patient. Regardless of whether an individual receiving care at a correctional treatment center is an inmate or parolee, the individual is also a patient who has certain rights and is entitled to protection.[19] Accordingly, the

---

"proper and accurate documentation is maintained by the licensed correctional treatment center in conjunction with inmate-patient transfers."

[19]    That a patient's change of status from inmate to parolee does not discharge a licensed health facility from its obligations toward the patient is demonstrated in the Department's contract with Health Net Federal Services. That contract addresses the contractor's obligation to provide continued care to inmates who reach their parole date while in the contractor's care – the contractor agreed the parole date would not "prevent an inmate from receiving emergency medical services or result in being discharged prematurely." Moreover, the contractor would receive assistance in providing appropriate follow-up care, including either transferring the patient to a community health facility in the parole region, the patient receiving continued care in the current facility, or transfer to outpatient care in the area of parole release. Notably, the contract does not allow the contractor to deliver the patient to another facility's emergency room if a suitable placement cannot be found.

prohibition against transferring patients to another facility unless advance arrangements have been made for admission to that facility applies to parolees as well as inmates.

On the second point, the Department contends regulation 79789 does not require Hospital Authority's "express agreement before CDCR may assist a parolee in seeking medical care from its safety net hospital." Relying on a dictionary definition of the word "arrangement,"[20] the Department asserts it need only work together with Hospital Authority to arrange the transfer as a preliminary measure and Hospital Authority's express agreement to accept the patient for admission is not required.

A patient transfer under regulation 79789 requires that "arrangements have been made in advance for admission to such a health facility." (Cal. Code Regs., § 79789(b).) One appellate court addressing the meaning of the word "arrangement" in another context noted the word "means '[a]n agreement with someone,' " and "has been defined as 'a mutual agreement or understanding (as between persons or nations).' " (*People v. Martinez* (2020) 59 Cal.App.5th 280, 297-298, review granted Mar. 17, 2021, S267138.) Moreover, an agreement can be " 'an arrangement (as between two or more parties) as to a course of action.' " (*Id.* at p. 298.) Thus, the word "arrangement" "suggests at least mutuality and assent regardless of the degree of informality." (*Ibid.*)

Based on these definitions, an arrangement for admission means there must at least be a mutual agreement that the receiving facility will admit the patient. Even under the Department's definitions, an informal agreement concerning the transfer is required. To fulfill the purpose of the regulation, KMC must agree to accept the parolees for admission before the transfer occurs.

---

[20]    The Department cites to the following definitions of the word "arrangement": (1) "the state of being arranged"; and (2) "something arranged: such as … a preliminary measure" or "an informal agreement or settlement especially on personal, social, or political matters." (Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/arrangements [as of May 26, 2023].)

The Department appears to be asserting it need not comply with regulation 79789(b) because it is not transferring the parolees to KMC for admission, but rather discharging them to parole and then delivering them to the emergency room, where KMC is obligated to assess them. But this is not a situation where the parolees needed emergency medical care; rather, it is undisputed they needed transfer to skilled nursing facilities. While KMC is required under the EMTALA to perform a medical screening examination if the parolees present to the emergency department requesting an examination or treatment, it need not admit them as inpatients unless they require stabilization of an emergency medical condition. (42 C.F.R. § 489.24(a)(1)(ii) & (d)(2)(i).) KMC admitted the parolees, not because they had emergency medical conditions that needed stabilizing, but rather because they could not care for themselves and needed skilled nursing care.

The Department asserts it is not demanding that the parolees delivered to the emergency department be admitted to the hospital. However, the Department knew, or certainly should have known, the hospital would have no choice but to admit them since, as the Department concedes, there were no skilled nursing facilities that would accept them, and they could not be safely released to the streets. By delivering them to the emergency department knowing they would necessarily be admitted to the hospital, the Department achieved a transfer of a patient to another facility without first arranging for the patient's admission as required by regulation 79789.

The Department asserts that requiring it to make arrangements for admission before transferring the parolees is not a matter subject to mandamus because it is not a ministerial act. But obtaining relief by means of mandate may be appropriate even though the approval and cooperation of third parties is required. (*Morris, supra,* 94 Cal.App.4th at pp. 61-62 [rejecting argument that writ of mandate compelling fulfillment of legal duty to comply with licensing requirements for correctional treatment centers should not issue because compliance could not be achieved without the approval

and cooperation of third parties].) In issuing a writ of mandate, the trial court compelled the Department to fulfill its legal duty to obtain Hospital Authority's express agreement before transferring any parolee under care at any licensed CDCR medical facility. This was appropriate even though the Department will need the approval and cooperation of the Hospital Authority in effecting the transfer.

The Department claims requiring it to obtain the hospital's consent to transfer the parolees conflicts with its obligation to provide health care to those in custody. It asserts it only has a constitutional duty to provide medical care to inmates while in custody, while counties are responsible for providing medical services to indigent parolees. In support, the Department points to a Kern County ordinance that requires Hospital Authority to provide health care services to indigent county residents and Hospital Authority's agreement with Kern County to provide medical services to indigent county residents. Even so, the Department cannot shirk its duty to the parolees as correctional treatment center patients.

The Department contends interpreting regulation 79789 as applying to parolees and requiring Hospital Authority's consent for transfer is inconsistent with the parolees' right to be released from custody after serving their sentences, as well as their right to avail themselves of community services, including emergency department services. The Department reasons that conditioning release from prison on an emergency department's consent to medically examine the individual would lead to an absurd result, as it would condition the parolee's right to liberty on the approval of hospital administrators in likely violation of the parolees' constitutional right to release from confinement.

We recognize the tension between the Department's duty to the parolees as patients and the parolees' liberty interest. While the parolees have the right as correctional treatment center patients to be safely transferred to a skilled nursing facility or other facility willing to admit them, they also have the right to release from prison. This tension can be addressed, however, by modifying the peremptory writ of mandate to

21.

allow for a parolee's declination of further care and treatment at the correctional treatment center. In that circumstance, the Department may assist with arranging for the parolee's transport to an emergency department without first obtaining the medical facility's consent. This leaves the parolee with the following options – either remain a patient at the correctional treatment center until a skilled nursing or other medical facility is found that agrees to accept the parolee for admission, or be medically discharged at the parolee's request. What the Department cannot do is drop the parolees off at the emergency department while the parolees remain correctional treatment center patients without making advance arrangements for their admission to the hospital.

This modification to the peremptory writ of mandate addresses the Department's concern the injunction impermissibly infringes on its discretionary parole authority under Penal Code section 3003 because, although the trial court did not prohibit it from paroling parolees to Kern County, it "will in some circumstances" be prevented from paroling individuals to Kern County. A parolee who decides to remain a correctional treatment center patient may still be paroled to Kern County upon locating a medical facility willing to accept the parolee, while a parolee who consents to be medically discharged from a correctional treatment center may be taken to a Kern County emergency department.

### Conclusion

In sum, Hospital Authority established the Department failed to comply with regulation 79789 when transferring the parolees to KMC, and therefore abused its discretion.[21] In view of the Department's insistence that it would continue to transport

---

[21]    Since we conclude the Department had a duty to comply with regulation 79789(b)'s requirement that it make arrangements for the transfer of the parolees before transferring them to a Hospital Authority medical facility, we do not address Hospital Authority's arguments that the Department abused its discretion under other statutes and regulations by placing parolees who need long term care at KMC.

parolees who are patients of its correctional treatment centers to KMC without its consent for admission, the trial court was justified in granting judgment enjoining the Department from transferring any parolee under its care at any licensed CDCR medical facility to Hospital Authority's facilities upon parole without Hospital Authority's express agreement for transfer, unless a bona fide medical emergency existed. The judgment, however, does not account for a parolee's right to be medically discharged from the correctional treatment center and to request examination and treatment at a Hospital Authority facility. Accordingly, we will order the judgment modified.

## DISPOSITION

The matter is remanded for the trial court to modify the judgment at paragraph 5, starting with the second sentence, as follows (with the modifications in italics):

"The Court permanently enjoins transfer by Respondents of any prisoner or parolee who is under care at any licensed CDCR medical facility upon parole, *unless the parolee has requested a medical discharge from the CDCR medical facility*, to Petitioner's facilities without Petitioner's express agreement for the transfer, unless there is a bona fide medical emergency that requires emergency transport by ambulance through the Kern County emergency response system, where the Petitioner is the designated receiving hospital emergency department at the time for that system."

The trial court is ordered to issue a new peremptory writ. As so modified, the judgment is affirmed. The parties shall bear their own costs on appeal.


DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.

23.